WMP:WPC
F.#2012R00983

# 13 M 535

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

ANDREW BARRETT,

        Defendant.

- - - - - - - - - - - - - - - - - -X

IN THE MATTER OF AN APPLICATION
FOR A SEARCH WARRANT FOR THE
PREMISES KNOWN AND DESCRIBED AS:

ECONOMY DRUG AND SURGICAL PHARMACY,
221-21 JAMAICA AVENUE, QUEENS,
NEW YORK ("SUBJECT PREMISES #1"),

and

EDS HEALTHCARE PHARMACY, INC.,
30 VAN SICLEN AVENUE, FLORAL PARK,
NEW YORK ("SUBJECT PREMISES #2")
(COLLECTIVELY, THE "SUBJECT
PREMISES").

- - - - - - - - - - - - - - - - - -X
EASTERN DISTRICT OF NEW YORK, SS:

**TO BE FILED UNDER SEAL**

COMPLAINT AND AFFIDAVIT
IN SUPPORT OF APPLICATION
FOR ARREST AND SEARCH
WARRANTS

        NAOMI D. GRUCHACZ, being duly sworn, deposes and states

that she is a Special Agent with the United States Department of

Health and Human Services, Office of the Inspector General

("HHS-OIG"), duly appointed according to law and acting as such.

        In or about and between January 2011 to June 2013,

within the Eastern District of New York and elsewhere, the

-1-

defendant ANDREW BARRETT, together with others, did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud Medicare and Medicaid and to obtain, by means of material false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody of, Medicare and Medicaid in connection with the delivery of and payment for health care benefits, items, and services.

(Title 18, United States Code, Section 1347)

Upon information and belief, there is probable cause to believe that there is located in THE PREMISES KNOWN AND DESCRIBED AS ECONOMY DRUG AND SURGICAL PHARMACY ("ECONOMY DRUG"), 221-21 JAMAICA AVENUE, QUEENS, NEW YORK ("SUBJECT PREMISES #1"), and EDS HEALTHCARE PHARMACY, INC. ("EDS"), 30 VAN SICLEN AVENUE, FLORAL PARK, NEW YORK ("SUBJECT PREMISES #2"), further described in Attachment A, for the things described in Attachment B, which constitute evidence, fruits and instrumentalities of health care fraud, in violation of Title 18, United States Code, Section 1347.

(Title 18, United States Code, Section 1347)

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.    I am a Special Agent with the United States

---

[1] Because this affidavit is submitted for the limited purpose of establishing probable cause for an arrest warrant and probable cause for a search warrant, I have not set forth each and every fact learned during the course of the investigation.

Department of Health and Human Services, Office of the Inspector General ("HHS-OIG") and am currently assigned to investigate health care fraud violations, including schemes to defraud the Medicare and Medicaid programs.   I have been personally involved in the investigation relating to allegations of violations and attempted violations of Title 18, United States Code, Section 1347 (Health Care Fraud), by the defendant ANDREW BARRETT, ECONOMY DRUG AND SURGICAL PHARMACY ("ECONOMY DRUGS"), EDS HEALTHCARE PHARMACY, INC. ("EDS") and others known and unknown.

2.   I have been an HHS-OIG Special Agent for approximately three years.   Previously, I was a Special Agent with the United States Department of State, Diplomatic Security Service, for approximately eight years.   In 2009, I earned a Master's of Public Administration in Health Care Policy and Management from New York University.   During my tenure with HHS-OIG, I have participated in a variety of health care fraud investigations.

3.   I have personally participated in the investigation of the offenses discussed below.   I am familiar with the facts and circumstances of this investigation from: (a) my personal participation in this investigation, (b) reports made to me by other law enforcement authorities, and (c) information obtained from confidential sources of information.   Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and

-3-

facts of which I have hearsay knowledge.

I.   BACKGROUND REGARDING HEALTH CARE BENEFIT PROGRAMS

    A.   The Medicare Program

       4.   Medicare is a federal health care program providing benefits to persons who are over the age of 65 or disabled.  Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.  Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."

       5.   Medicare is a "health care benefit program" as defined by Title 18, United States Code, Section 24(b) and referenced in Title 18, United States Code, Section 1347.

       6.   Medicare is subdivided into multiple Parts. Prescription drug coverage is provided through Medicare Part D, which covers the costs of most prescription drugs for Medicare beneficiaries.  Part D of the Medicare program was enacted as part of the Medicare Prescription Drug, Improvement and Modernization Act of 2003.

       7.   Medicare Part D is administered by private insurance plans that are reimbursed by Medicare through CMS. Medicare Part D subsidizes the costs of prescription drugs by prospectively paying private insurers monthly payments to provide Medicare-covered benefits to Medicare beneficiaries.

       8.   Medicare beneficiaries can obtain Part D benefits

-4-

in two ways: (i) by joining a Prescription Drug Plan, which covers only prescription drugs, or (ii) by joining a Medicare Advantage Plan, which covers both prescription drugs and medical services, (collectively, "Part D Plans").

9. Under Part D, a pharmacy can contract with multiple Part D Plans or their Pharmacy Benefit Managers ("PBMs"), which provide Medicare Part D coverage. A pharmacy also can submit claims for payment to a Part D Plan with which it does not have a contract. Under either arrangement, the pharmacy submits claims for prescriptions filled for Medicare Part D beneficiaries.

10. Most Part D plans contract with a PBM to administer processing and payment of prescription drug claims. Further, pharmacies typically contract with the Part D Plans' PBMs either directly or through a third-party administrator often referred to as a Pharmacy Services Administrative Organization ("PSAO").

11. Typically, a Medicare beneficiary enrolled in a Part D Plan obtains their prescription medications from a pharmacy authorized by the beneficiary's Part D Plan. After filling a beneficiary's prescription, the pharmacy then submits the prescription drug claim to a Part D Plan or PBM for payment under the beneficiary's Health Insurance Claim Number and/or Medicare Plan identification number. Then, the Part D Plan or PBM sends a reimbursement check to the pharmacy or initiates an

-5-

electronic transfer of funds to the pharmacy's bank account.

12.  Each Part D Plan submits to CMS a record of each prescription drug claim it receives from a pharmacy; this record is commonly referred to as a prescription Drug Event ("PDE"). All PDE records accepted by CMS are stored in CMS's Integrated Data Repository for use in calculating expected Part D costs for the following year.

13.  Under federal regulations, Part D plans must ensure that pharmacies that submit prescription drug claims for reimbursement under Part D are contractually required to maintain records for ten years.  See 42 C.F.R. 423.505(i)(2).

B.  The Medicaid Program

14.  Medicaid is a health and long-term care coverage program that is jointly financed by states and the federal government as established by the Social Security Act of 1965.

15.  Medicaid is a "health care benefit program" as defined by Title 18, United States Code, Section 24(b) and referenced in Title 18, United States Code, Section 1347.

16.  Each state establishes and administers its own Medicaid program and determines the type, amount, duration and scope of services covered within broad federal guidelines.

17.  New York State Medicaid is administered by the New York State Department of Health.

18.  The New York State Medicaid Pharmacy program covers medically necessary FDA approved prescription and

-6-

non-prescription drugs for Medicaid fee-for-service enrollees

19.    Chapter 639 of the Laws of the State of New York,
1976, mandated that a statewide Medicaid Management Information
System (MMIS) be designed, developed and implemented. New York
State's MMIS, called eMedNY, is a computerized system for claims
processing which also provides information upon which management
decisions can be made.

20.    The New York State Department of Health ("DOH")
has contracted with Computer Sciences Corporation ("CSC") to be
the Medicaid fiscal agent.  CSC, in its role as fiscal agent,
maintains a Medicaid claims processing system to meet New York
State and Federal Medicaid requirements.

21.    Medicaid providers must bill all applicable
insurance sources before submitting claims to Medicaid. Payment
from those sources must be received before submitting a Medicaid
claim. Medicaid providers may not refuse to furnish services to
an individual eligible to receive such services because of a
third party's liability for payment for the service.  Third party
insurers and corresponding coverage codes for a Medicaid-eligible
enrollee can be found online in the Information for All
Providers, Third Party Information Manual at:
http://www.emedny.org/ProviderManuals/AllProviders/index.html.

22.    Medicaid providers' rights and obligations are
defined in part 504, 515, 517, 518 and 519 of Title 18 of the New
York Code of Rules and Regulations which are found online at:

http://www.health.state.ny.us/nysdoh/phforum/nycrr18.htm.

23. Medicaid enrollees can obtain pharmacy benefits either through the Fee for Service ("FFS") or Medicaid Managed Care ("MMC").

24. Medicaid beneficiaries enrolled in FFS plans obtain their prescription medications from licensed pharmacies. After dispensing an enrollee's prescription, the pharmacy then submits the prescription drug claim to CSC for payment under the enrollee's identification number. CSC then sends a reimbursement check to the pharmacy or initiates an electronic transfer of funds to the pharmacy's bank account.

25. Medicaid beneficiaries enrolled in MMC plans obtain their prescription medications from a pharmacy authorized by the beneficiaries' plans Managed Care Plan. After dispensing the enrollee's prescription, the pharmacy then submits the prescription drug claim to the MMC plan for payment under the enrollee's MMC number and/or Medicaid identification number. The MMC plan then sends a reimbursement check to the pharmacy or initiates an electronic transfer of funds to the pharmacy's bank account.

26. The maintenance and furnishing of information relative to care included on a Medicaid or MMC claim is a basic condition for participation in the New York State Medicaid Pharmacy Program. For auditing purposes, records on enrollees must be maintained and be available to authorized Medicaid

-8-

officials for six years following the date of payment.  Failure

to conform to these requirements may affect payment and may

jeopardize a provider's eligibility to continue as a Medicaid

participant.  The information for All Providers, Third Party

Information Manual is located at:

http://www.emedny.org/ProviderManuals/AllProviders/index.html and

http://www.health.state.ny.us/nysdoh/phforum/nycrr18.htm.

II.  <u>TECHNICAL TERMS</u>

     27.  Based on my training and experience, I use the

following technical terms to convey the following meanings:

     a.  IP Address: The Internet Protocol address (or

simply "IP address") is a unique numeric address used by

computers on the Internet.  An IP address looks like a series of

four numbers, each in the range 0-255, separated by periods

(e.g., 121.56.97.178).  Every computer attached to the Internet

must be assigned an IP address so that Internet traffic sent from

and directed to that computer may be directed properly from its

source to its destination.  Most Internet service providers

control a range of IP addresses.  Some computers have static-that

is, long-term-IP addresses, while other computers have

dynamic-that is, frequently changed-IP addresses.

     b.  Computer: A computer includes all types of

electronic, magnetic, optical, electrochemical, or other high

speed data processing devices performing logical, arithmetic, or

storage functions, including desktop computers, notebook

computers, mobile phones, tablets, server computers, and network hardware.

c.    Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

d.    Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

III.  THE DEFENDANT and THE SUBJECT PREMISES

28.    The defendant ANDREW BARRETT, who resides at 341 Pleasant Hill Drive, New City, New York 10956, is a licensed pharmacist in the state of New York.  BARRETT is the owner and sole proprietor of ECONOMY DRUG AND SURGICAL PHARMACY ("ECONOMY DRUG") and EDS HEALTHCARE PHARMACY, INC. ("EDS").

29.    ECONOMY DRUG is located on the first floor/street level of a two-story building at 221-21 Jamaica Avenue, Queens, New York ("SUBJECT PREMISES #1").  It is a two-story, attached, red-brick building on the northwest corner of Jamaica Avenue and 222nd Street, facing south.  The building has plate-glass windows on all sides, a main door, which is glass and opens outward, on its west side, and a side door, which is metal and also opens

-10-

outward, on its north side. Attached as Exhibit 1 is a photograph of the front and side of the building.

30. EDS is located at 30 VAN SICLEN AVENUE, FLORAL PARK, NEW YORK ("SUBJECT PREMISES #2"). It is a white, single-story warehouse-type building. The front of the building has a door on the left side and a silver-colored cargo gate in the center. Attached as Exhibit 2 is photograph of the front of the building.

31. I have been informed by an Assistant U.S. Attorney that, under the relevant case law, in the event of a search of business premises that are "permeated with fraud," a broad search warrant that authorizes the search and seizure of voluminous business records does not run afoul of the Fourth Amendment. National City Trading Corp. v. United States, 635 F.2d 1020, 1026 (2d Cir. 1980) (citing United States v. Brien, 617 F.2d 299, 309 (1st Cir. 1980)); see also United States v. Johnson, 108 F.3d 1370, 1997 WL 136332, at *3 (2d Cir. Mar. 21, 1997) (unpublished summary order) (affirming broad search where affidavit "show[ed] ample ground for finding pervasive fraud"). In this case, given the apparent interconnections of the various business entities and individuals and the resulting fraud schemes, as set forth below, a broad seizure of data in the SUBJECT PREMISES is warranted.

IV.  FACTS SUPPORTING PROBABLE CAUSE

32.  During the course of the investigation, three undercover law enforcement investigators, acting as Medicaid recipients with prescriptions, entered into ECONOMY DRUGS to fill the prescriptions as set forth the below.

A.  Undercover Agent #1

33.  Undercover Agent #1 ("UC-1"), a law enforcement investigator acting in an undercover capacity whose identity is known to your Affiant, had an undercover Medicaid card and an undercover prescription for Atripla, a medication used to treat human immunodeficiency virus ("HIV").  UC-1's prescription was for 30 pills of Atripla with three refills.

34.  On or about March 23, 2012, UC-1 entered ECONOMY DRUGS for purposes of filling the prescription.  UC-1 handed the prescription and Medicaid card to an employee at ECONOMY DRUGS. UC-1 obtained 30 pills of Atripla and exited the pharmacy.  UC-1 never requested or obtained any other pills from that prescription.

35.  I have reviewed the Medicaid billing data associated with UC-1.  The data indicates that:

a.  ECONOMY DRUGS billed Medicaid in April, May and June 2012, for three refills of the March 23, 2012 prescription.  UC-1 informed me that UC-1 never requested that the prescription be refilled and that UC-1 never obtained any other refills associated with the March 23, 2013 prescription.

-12-

b. ECONOMY DRUGS billed Medicaid six additional
times, from July 2012 to November 2012, for six additional
purported prescriptions for Atripla filled for UC-1. The billing
indicated that the prescriptions were called in by a doctor. UC-
1 informed me that UC-1 did not have any doctor call in a
prescription for UC-1 and that UC-1 did not obtain any additional
medications from ECONOMY DRUG.

36. The Medicaid billing data associated with the
above-referenced unauthorized prescription refills and call-ins
for UC-1 reveals that the defendant ANDREW BARRETT is identified,
with his pharmaceutical license number, as the authorizing
pharmacist for each of the unauthorized transactions associated
with UC-1. A review of the Medicaid data further reveals that
ECONOMY DRUGS was paid approximately $15,600 by Medicaid for the
above-referenced unauthorized prescription refills and call-ins
for UC-1.

B. Undercover Agent #2

37. Undercover Agent #2 ("UC-2"), a law enforcement
investigator acting in an undercover capacity whose identity is
known to your Affiant, had an undercover Medicaid card and an
undercover prescription for Atripla, a medication used to treat
HIV. UC-2's prescription was for 30 pills of Atripla with three
refills.

38. On or about June 29, 2012, UC-2 entered ECONOMY
DRUGS for purposes of filling the prescription. UC-2 handed the

-13-

prescription and Medicaid card to an employee at ECONOMY DRUG. .
UC-2 obtained 30 pills of Atripla, declined the automatic refill
option and exited the pharmacy.  UC-2 never requested or obtained
any other Atripla pills from that prescription.

39.  I have reviewed the Medicaid billing data
associated with UC-2.  The data indicates that:

a.    ECONOMY DRUG billed Medicaid in July, August
and September 2012, for three refills of the June 29, 2012
prescription.  UC-2 informed me that UC-2 never requested that
the prescription be refilled and that UC-2 never obtained any
refills associated with the June 29, 2013 prescription.

b.    ECONOMY DRUG billed Medicaid three additional
times, from October 2012 to November 2012, for three additional
purported prescriptions for Atripla filled for UC-2.  The billing
indicated that the prescriptions were called in by a doctor.  UC-
2 informed me that UC-2 did not have any doctor call in a
prescription for UC-2 and that UC-2 did not obtain any additional
medications from ECONOMY DRUG.

40.  The Medicaid billing data associated with the
above-referenced unauthorized prescription refills and call-ins
for UC-2 reveals that the defendant ANDREW BARRETT is identified,
with his pharmaceutical license number, as the authorizing
pharmacist for each of the unauthorized transactions associated
with UC-2.  A review of the Medicaid data further reveals that
ECONOMY DRUGS was paid approximately $9,400 by Medicaid for the

-14-

above-referenced unauthorized prescription refills and call-ins for UC-2.

C.   Undercover Agent #3

41.   Undercover Agent #3 ("UC-3"), a law enforcement investigator acting in an undercover capacity whose identity is known to your affiant, had an undercover Medicaid card and an undercover prescription for Atripla medication to treat HIV.   The prescription was for 30 pills of Atripla with three refills.

42.   On or about August 10, 2012, UC-3 entered ECONOMY DRUGS for purposes of filling the prescription.   UC-3 handed the prescription and Medicaid card to an employee at ECONOMY DRUG. UC-3 indicated on the electronic signature pad at the pharmacy that UC-3 did not want the prescription to be filled automatically and instead would personally request the refills. UC-3 obtained 30 pills of Atripla and exited the pharmacy.   UC-3 never requested or obtained any other Atripla pills from that prescription.

43.   I have reviewed the Medicaid billing data associated with UC-3.   The data indicates that:

a.   ECONOMY DRUG billed Medicaid in September and October 2012, for three refills of the August 10, 2012 prescription.   UC-3 informed me that UC-3 never requested that the prescription be refilled and that UC-3 never obtained any refills associated with the August 10, 2012 prescription.

b.   ECONOMY DRUG billed Medicaid three additional

-15-

times, from November 2012 to January 2013, for three additional
purported prescriptions for Atripla filled for UC-2. The billing
indicated that the prescriptions were called in by a doctor. UC-
3 informed me that UC-3 did not have any doctor call in a
prescription for UC-3 and that UC-3 did not obtain any additional
medications from ECONOMY DRUG.

44. The Medicaid billing data associated with the
above-referenced unauthorized prescription refills and call-ins
for UC-3 reveals that the defendant ANDREW BARRETT is identified,
with his pharmaceutical license number, as the authorizing
pharmacist for each of the unauthorized transactions associated
with UC-3. A review of the Medicaid data further reveals that
ECONOMY DRUGS was paid approximately $10,600 by Medicaid for the
above-referenced unauthorized prescription refills and call-ins
for UC-3.

D. Confidential Informant #1

48. Confidential Informant #1 ("CI-1") is an
individual whose identity is known to your Affiant and who is
awaiting sentence after pleading guilty in 2013 to Bank Fraud,
Wire Fraud and Conspiracy to Commit Bank Fraud. CI-1 is an
employee of ECONOMY DRUGS. Throughout the course of CI-1's
employment, CI-1 has had access to ECONOMY DRUG and EDS and has
knowledge about the inner workings of ECONOMY DRUG and EDS. CI-1
provided your Affiant, in sum and substance, and in part, with
the following information:

-16-

a. ECONOMY DRUG contains several computers which are used for filling prescriptions and billing Medicare, Medicaid and private insurance companies. Additionally, the computers at ECONOMY DRUG are used for all business payments and reimbursements.

b. EDS contains several computers used to bill Medicaid, Medicare and private insurance companies.

c. The defendant ANDREW BARRETT uses a laptop computer to fill prescriptions while he away is from EDS and ECONOMY DRUGS.

d. On or about December 17, 2012, the defendant ANDREW BARRETT moved all prescription delivery services from ECONOMY DRUG to EDS. BARRETT told CI-1 that this move to EDS in Nassau County was designed to "save" money by not paying the higher New York City taxes associated with ECONOMY DRUG. EDS is neither approved nor authorized to bill Medicaid directly.[2]

e. The defendant ANDREW BARRETT used the EDS facility to physically prepare and bottle prescription medications while labeling the bottles with ECONOMY DRUG labels.

f. BARRETT keeps notebooks at both EDS and ECONOMY DRUGS with information regarding the original prescriptions and when to refill them.

g. BARRETT is the only individual who handles

---

[2] I have confirmed with Medicaid that EDS is neither approved nor authorized to bill Medicaid directly.

the automatic prescription refills and the billing of those refills.

E.    The Statements of the Defendant ANDREW BARRETT

46.    On October 2, 2012, your Affiant interviewed the defendant ANDREW BARRETT, who stated, in sum and substance, and in part, the following:

a.    BARRETT is the sole owner of ECONOMY DRUG. BARRETT, who also owns EDS and other pharmacies, spends appoximately 3 to 5 hours at ECONOMY DRUG supervising and filling prescriptions, where 20% of ECONOMY DRUG's prescriptions are for HIV medications and 60% of its revenue comes from HIV medication reimbursements. Atripla is a highly-billed HIV medication at ECONOMY DRUG, and unlike most other HIV medications, Atripla does not have generic manufacturer equivalents. Therefore, BARRETT could bill up to $1,800 per prescription. BARRETT makes a profit of $80 per Atripla prescription as compared to lower profits for other HIV medications.

b.    ECONOMY DRUGS uses an internet-based software for prescription authorization and billing. Each pharmacist has a personal log-in identifier for the computer system. When a pharmacist enters a prescription in the system, his/her initials are recorded with the prescription. The prescription authorizations are then sent to the insurer to determine whether coverage is accepted or denied, which is immediately communicated.

-18-

c.    BARRETT conducts a daily review of the previously-filled prescriptions to determine whether any are due for a refill.  BARRETT automatically refills prescriptions approximately 5 to 7 days before the prescription is due.  If a prescription is not accepted, delivered or picked up by a patient in a month, then BARRETT will put the prescription back in stock and reverse the charges to the insurer.

d.    Most insurers send their payments to ECONOMY DRUG by electronic fund transfers.  ECONOMY DRUG receives payments through its bank account at Capital One bank.

47.    I have reviewed the Capitol Bank records foe ECONOMY DRUG.  The defendant ANDREW BARRETT and his wife are the sole signatories for that account.

48.    I have also reviewed the Medicaid enrollment contract for ECONOMY DRUG, and the defendant ANDREW BARRETT is the sole signatory on the contract.

V.    TECHNICAL BACKGROUND

49.    As described above and in Attachment B, this application seeks permission to search for records that might be found on the SUBJECT PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

-19-

50.   I submit that if a computer or storage medium is found on the SUBJECT PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.   Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.   Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the storage medium that is not currently being used by an active file – for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.   Wholly apart from user-generated files, computer storage media - in particular, computers' internal hard drives - contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of

-20-

operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

51. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and

-21-

passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, email, email address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible

-22-

to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

   e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

   f.  I know that when an individual uses a computer to submit fraudulent billing information to Medicare and Medicaid, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the

-23-

criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

52. In most cases, a thorough search of a premises for information that might be stored on storage media often requires agents to seize physical storage media and later review the media consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on the Premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months,

-24-

depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.      Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the PREMISES. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.      Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

53.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to

-25-

determine whether it is evidence described by the warrant.

VI.  CONCLUSION

54.  Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that the defendant ANDREW BARRETT committed a crime. Accordingly, an arrest warrant is requested.

55.  Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that on the SUBJECT PREMISES there exists evidence of crimes.  Accordingly, a search warrant is requested.

56.  It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  I believe that sealing these documents is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations, and that not all of the targets of this investigation will be searched at this time.  Based upon my training and experience, I have learned that criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other criminals as they deem appropriate, e.g., by posting them publicly through online forums.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

-26-

WHEREFORE, your Affiant respectfully requests that the requested search warrant be issued for THE PREMISES KNOWN AND DESCRIBED AS ECONOMY DRUG AND SURGICAL PHARMACY, 221-21 JAMAICA AVENUE, QUEENS, NEW YORK ("SUBJECT PREMISES #1"), and EDS HEALTHCARE PHARMACY, INC., 30 VAN SICLEN AVENUE, FLORAL PARK, NEW YORK ("SUBJECT PREMISES #2")(COLLECTIVELY, THE "SUBJECT PREMISES"), and therein, to seize any and all books, records, documents and computers, all of which may constitute evidence, instrumentalities and fruits of violations of Title 18, United States Code, Section 1347.

WHEREFORE, your Affiant also respectfully requests that a warrant issue for the defendant ANDREW BARRETT so that he may be dealt with according to law.

-27-

IT IS FURTHER REQUESTED that all papers submitted in support of this application, including the application, search warrant and arrest warrant be sealed until further order of the Court.

NAOMI D. GRUCHACZ
Special Agent
Health and Human Services
Office of the Inspector General

Sworn to before me this
19th day of June, 2013

RELSKY
ge
k

-28-