UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

UNITED STATES OF AMERICA,

**MEMORANDUM AND ORDER**

- against -

15-CR-103 (KAM)

ANDREW BARRETT,
                    Defendant.

----------------------------------------X

**MATSUMOTO, United States District Judge:**

On March 11, 2015, a grand jury in the Eastern District of New York returned an indictment charging Andrew Barrett ("defendant"), a licensed pharmacist, with health care fraud; submitting false claims to the United States; money laundering; filing false personal income tax returns; filing false corporate tax returns; and aiding and assisting in the preparation of false corporate income tax returns. (*See* ECF No. 18, Indictment.) A superseding indictment adding additional money laundering counts was returned on October 28, 2015. (*See* ECF No. 56, Superseding Indictment, at ¶¶ 35-36.) At a conference on May 16, 2016, the government advised that it intends to seek a second superseding indictment adding additional wire fraud charges and potentially other charges as well. (*See* Transcript of May 16, 2016 Hearing, at 9.)

Defendant has moved to suppress two audits of his pharmacies that he contends are tainted by an illegal search of one of his pharmacy's computers. (ECF No. 72, Motion to Suppress

("Def. Mem.").) The court conducted a two-day suppression hearing on the motion between April 28, 2016 and April 29, 2016 (*see* April 29, 2016 docket entry) and has considered the parties' submissions. For the reasons provided below, the motion to suppress the first audit is DENIED as moot and the motion to suppress the second audit is DENIED.

**BACKGROUND**

*A.    Initial Acquisition of the Raw Claims Data*

On June 19, 2013, the government obtained search warrants that authorized government agents to search two pharmacies — as well as associated computers — owned by defendant, Economy Drug and Surgical Pharmacy ("Economy Drug" or "Economy") and EDS Healthcare Pharmacy Inc. ("EDS").[1] (Def. Mem., Ex. B.) On June 20, 2013, agents executed the search warrants at both Economy Drug and EDS. (*See* Suppression Hearing Transcript ("Tr.") 152.) Special Agent Naomi Gruchacz ("Agent Gruchacz"), a special agent with the Office of the Inspector General ("OIG") at the United States Department of Health and Human Services ("HHS"), participated in the search. (Def. Mem., Ex. B; Tr. 2, 152.) During the searches, agents "forensically imaged" — that is, copied — the hard drives of computers at both Economy Drug and EDS. (Tr. 152.) The agents copied the original computer data from Economy Drug and

---

[1] The warrant, by its own terms, expired on July 3, 2013. (Def. Mem., Ex. B.)

EDS onto new hard drives. (Tr. 155.) The new hard drives were returned to the regional HHS/OIG office in New York and the data contained on the hard drives was copied to the office's internal server. (Tr. 155, 177.) The agents discovered that the seized data was stored in a proprietary format which was unreadable without the input of OPUS, a type of pharmacy management software maintained by Lagniappe Pharmacy Services ("Lagniappe"). (Tr. 58-60, 68, 153.)

Pharmacy clients like Economy or EDS would install the OPUS software onto their pharmacy computer and then pay a monthly maintenance fee for Lagniappe to provide software and hardware maintenance. (Tr. 59.) The arrangement provided OPUS employees the ability to log into a pharmacy client's on-site store computers at any time. (Tr. 59, 85, 112; Def. Mem., Exs. H-I; *see also* Suppression Hearing Exhibit ("Supp. Hr. Ex.") C.) During the day, OPUS needed to seek customer permission to access the store computers to avoid disrupting daily pharmacy operations that utilized the computers. (Tr. 111; Supp. Hr. Ex. C.) At night, however, OPUS could log in without notifying or disrupting the customer. (Supp. Hr. Ex. C.)

B.    *Converting the Raw Pharmacy Data into Readable Form*

OPUS officials told Agent Gruchacz that, in order to provide the raw data in a readable format, OPUS needed to analyze the raw data at its own facility. (Tr. 153; Def. Mem., Ex. D.)

Although OPUS maintained some "remote storage," OPUS Chief Operating Officer Tracy Ward wrote in an email to Agent Gruchacz on July 5, 2013, the remote storage at OPUS would "not be as complete as the data on the [imaged] hard drive[s]." (Def. Mem., Ex. D; Tr. 154.) An HHS/OIG computer forensic team then placed the raw data onto a single hard drive with two folders, one for Economy data and one for EDS data. (Tr. 154.) Agent Gruchacz sent the hard drive to OPUS by mail, along with a grand jury subpoena, on July 11, 2013. (Def. Mem., Ex. E; 3500-NG-1, at 29.)

On July 12, 2013, the hard drive arrived at OPUS. (3500-NG-1, at 29.) OPUS development lead Brian Steinberg[2] subsequently downloaded the data from the hard drive onto his laptop. (Tr. 64-65.) Agent Gruchacz worked closely with Steinberg as Steinberg exported the raw data obtained during the search into Excel spreadsheets that would contain readable information about claims dispensed by the Economy and EDS pharmacies. (Def. Mem., Ex. F; Tr. 154-55.) Agent Gruchacz spoke on the phone and emailed with Steinberg on multiple occasions between July 12, 2013 and July 17, 2013 to help Steinberg select the appropriate data fields[3] for inclusion in the spreadsheets. (Def. Mem., Ex. F; Tr. 155.) The

---

[2] In his capacity as development lead, Steinberg handled maintenance, programming, and high-level technical support. (Tr. 63.)
[3] Steinberg included data fields selected by Agent Gruchacz (e.g., beneficiary name, type of prescription, insurers billed, refills authorized, quantity filled, and amount billed) and omitted irrelevant fields of data (e.g., medication dosing instructions). (Def. Mem., Exs. D-F; Tr. 67-69.)

selected data fields would appear as columns with headings on the spreadsheets. (Tr. 68-69.)

On July 17, 2013, Steinberg, through a secure upload site, sent Agent Gruchacz two Excel files containing readable data: one for Economy and one for EDS. (Def. Mem., Ex. F; Tr. 68-69, 155.) The two Excel files each contained five separate tabbed spreadsheets: one tab for each year between 2009 and 2013. (Def. Mem., Ex. F; Tr. 68-69.) In order to protect sensitive medical information, Steinberg subsequently deleted all of the data he downloaded from the hard drive he received from HHS/OIG and all of the spreadsheets he created from his laptop, and destroyed the hard drive sent by Agent Gruchacz that contained the raw Economy and EDS claims data. (Tr. 69-72, 156-57.) Agent Gruchacz downloaded the two Excel files from the secure upload site to a single folder on the HHS/OIG network. (Tr. 155-156, 222-23.) Agent Gruchacz did not immediately review the two Excel files closely, but only checked to see that there were tabs in each Excel file for each year for which she had requested data. (Tr. 156.)

C. *The Subsequent August 8, 2013 Search*

Between late July 2013 and early August 2013, Agent Gruchacz began to prepare the data she had obtained from OPUS to send to the National Benefit Integrity Medicare Drug Integrity

Contractor (the "MEDIC")[4] for an audit comparing the claims processed by Economy and EDS against the two pharmacies' wholesale drug purchases. (Def. Mem., Exs. F-I; Tr. 20-22.) The audit was designed to reveal whether the pharmacies had purchased sufficient pharmaceuticals to cover the number of claims that were processed by health insurance plans including Medicare and Medicaid. (Tr. 53.) If a pharmacy purchased an insufficient number of pharmaceuticals to cover the number of claims the pharmacy processed, the discrepancy could be evidence of the submission of fraudulent claims.

Agent Gruchacz focused on 2011 and 2012 data for both Economy and EDS.[5] (Tr. 157.) As she began to take a closer look at the data, Agent Gruchacz became aware of two significant problems. First, she realized that if a pharmacy patient had a secondary insurer,[6] the spreadsheets for the pharmacies created a duplicate row that "made it look like there was double the quantity [of a prescription] being dispensed." (Tr. 100, 164; *see also* Def. Mem., Exs. F-H.) With Steinberg's assistance by phone and email, Agent Gruchacz eliminated the duplicate lines by filtering out the

---

[4] The MEDIC is an entity "charged by the government to oversee the Medicare Part D drug benefit program and identify fraud[,] waste[,] and abuse." (Tr. 20.)

[5] The alleged health care fraud, as charged in the superseding indictment, covers only 2011 and 2012. (*See* Superseding Indictment, at ¶¶ 25-30.)

[6] For example, a Medicare patient might have secondary insurance that would cover part of the cost of a medication. (Tr. 164.)

secondary insurer information. (Tr. 100, 164, 168; *see also* Def. Mem., Ex. F-H; 3500-NG-1, at 49.)

Agent Gruchacz also recognized a second problem with the Excel files sent by Steinberg. She testified that "there was only a month's worth of data for 2012 for EDS [Pharmacy]." (Tr. 157; *see also* Def. Mem., Exs. F-H.) The Excel file containing the Economy data, however, was complete and, according to Agent Gruchacz, "seemed fine." (Tr. 158.) Agent Gruchacz testified that Steinberg had made a mistake in generating the 2012 EDS spreadsheet tab, leaving substantial missing data. (Tr. 157.) After a conference call including Agent Gruchacz, Steinberg, and an employee of the MEDIC on August 6, 2013, Agent Gruchacz wrote that "[p]articipants discussed the potential of missing data for 2012 EDS pharmacy claims." (Def. Mem., Ex. G.)

In order to have Steinberg regenerate the 2012 EDS data, Agent Gruchacz testified that she initially intended to "send back [a] hard drive" containing a copy of EDS's raw, unreadable pharmacy data obtained in the June 20, 2013 search. (Tr. 158.) "At that point," she testified, "I didn't realize that [OPUS] had remote access to the systems for Economy and EDS." (Tr. 158.) Steinberg, however, "brought [] up as a possibility [] the fact that he could remotely access [the data]." (Tr. 158; *see also* Tr. 75-76.) Agent Gruchacz explained that she ultimately decided to ask Steinberg to access the EDS data remotely (even though she had the imaged hard

7

drives from the search as well as a copy of the imaged hard drives on the HHS/OIG server) because "it would be easier to obtain the data by them remotely logging on instead of having to go through the process of copying the hard drives again and sending them [to OPUS." (Tr. 162; *see also* Tr. 75-76.) Agent Gruchacz's emails to OPUS COO Ward also indicate that the statute of limitations window was closing on some of defendant's conduct. (Supp. Hr. Ex. C; *see also* Tr. 158 ("[W]e were working within a certain time period to try to get the analysis done.").)

On August 8, 2013, the following email exchange involving Agent Gruchacz, Ward, and Steinberg took place:

- Agent Gruchacz emailed Ward, asking if Ward could direct Steinberg to "check the 2012 data on the cloud server for EDS pharmacy now and transmit if there is additional data."

- Ward then wrote Steinberg, asking him to send Agent Gruchacz the missing data set.

- Steinberg responded to Ward: "I can but we need the customers [sic] blessing to log in during the day. At night I can easily do it. Please let her know I would prefer if she calls the customer if they want this today. Otherwise I will do it tonight. Tell her its [sic] not in the cloud we have to log on to their system in the store."

- Ward forwarded her discussion with Steinberg to Agent Gruchacz, and asked Agent Gruchacz to "confirm if you are wanting [Steinberg] to dial into the store. The data is not in the cloud."

- Agent Gruchacz subsequently responded to both Ward and Steinberg: "Sorry - I just read below [referring to the email exchange]. So I need to call the customer to request the log-in? If that is the case, then Brian if you can please log in

at night that would be great - as they are still under investigation. Thanks so much."

- Steinberg responded that he would "log in[] tonight. They wont [sic] know I was on the system."

- Agent Gruchacz responded to Steinberg: "Awesome! Than[]ks!"

(Supp. Hr. Ex. C.)

Although Agent Gruchacz stated in the affidavit she filed in support of the search warrants that she had some technical expertise (Def. Mem., Ex. B, pp. 19-26; *see also* Tr. 200-02), during the suppression hearing she testified that she had no experience with pharmacy management systems like OPUS. (Tr. 158-59, 181.) The investigation into defendant's activities was, according to Agent Gruchacz, "the first time that my agency had tried to obtain . . . pharmacy claims from a software company like OPUS." (Tr. 158.) Agent Gruchacz testified that she believed at the time that the data "was in the cloud, that [EDS and OPUS] had equal access to the data." (Tr. 160; see also Tr. 158-59.) Regarding the above-quoted August 8, 2013 email exchange, Agent Gruchacz testified on direct examination:

I read the e-mail. I don't think it registered with me at the time that he was saying "store" mean[t] that the data was only in the store and that it was not - at the time, my understanding was that it was data that was accessible by both OPUS and the pharmacy, and that what we were asking for was covered by the grand jury subpoena that we had sent them related to the hard drive, that it

was sort of, like, all and one in the same that they had equal access.[7]

(Tr. 161.)

On the evening of August 8, 2013, over one month after the search warrant had expired (*see* Def. Mem., Ex. B) and at the request of Agent Gruchacz, Steinberg logged onto the EDS on-site computers and downloaded EDS data covering 2009-2012. (Tr. 159; Def. Mem., Ex. I; Supp. Hr. Ex. C.) The data set Steinberg obtained from the EDS computer on August 8, 2013 was a subset of the exact same data set that the government had already obtained during the

---

[7] Agent Gruchacz testified further on cross-examination regarding the discrepancy between the August 8, 2013 email exchange and her testimony on direct examination:

Defense Counsel: So even though you testified yesterday that you believed it was in the cloud, the e-mail exchange you reviewed on August 8, 2013 said to tell you it's not in the cloud and we have to log onto their system in the store. Yes or no?

Agent Gruchacz: Correct. . . .

Defense Counsel: Now, then Tracy Ward sends you an e-mail on August 8, 2013 at 10:28 a.m., please confirm if you are wanting [Steinberg] to dial into the store. The data is not in the cloud. Correct?

Agent Gruchacz: Correct.

Defense Counsel: And you testified yesterday that you did not – that you thought it was in the cloud, correct?

Agent Gruchacz: Correct.

Defense Counsel: And you didn't understand what into the store meant, correct?

Agent Gruchacz: Correct.

(Tr. 231-33.)

execution of the search warrant at EDS on June 20, 2013.[8] Using the data he retrieved from EDS on August 8, 2013, Steinberg subsequently generated a single Excel file using the same data fields that he and Agent Gruchacz had agreed upon before he sent the first two Excel files on July 17, 2013. (Tr. 75-78.) Steinberg uploaded the spreadsheet containing the readable EDS data to a secure server, from which Agent Gruchacz downloaded it to the HHS/OIG server. (Tr. 77-78; Def. Mem., Ex. J; 3500-NG-1, at 53.) Steinberg then deleted all of the EDS data from his computer. (Tr. 78.)

D.    *The First Audit: MEDIC 1665*

On August 9, 2013, Agent Gruchacz began the process of producing a new spreadsheet that combined data copied from the 2011 and 2012 Economy data set sent by Steinberg on July 17, 2013 with the 2011 and 2012 EDS data set sent by Steinberg on August 8, 2013. (Tr. 164-66; Def. Mem., Ex. J; 3500-NG-1, at 53-55.) Agent Gruchacz placed the compiled Economy and EDS data into a single Excel file. (Tr. 167.) Combining Economy and EDS data, however, revealed a new problem. (Tr. 164-65.) Some of the EDS claims data were duplicates of the Economy claims data. (Tr. 165.) After discussing the duplicate entry problem with Steinberg on August 9,

---

[8] *See* Tr. 124 ("The Court: But the data that you retrieved on August 8th was a subset or a duplicate subset of what the government got through the search warrant . . . ?" Agent Gruchacz: "Yes, yes.").

2013, Agent Gruchacz came to understand that EDS had duplicated all of Economy's claims on its OPUS software when EDS first opened in 2012. (Def. Mem., Ex. J; 3500-NG-1, at 55; Tr. 120-25, 165-66, 243-44.) With Steinberg's advice and assistance over the phone and by email, Agent Gruchacz removed the duplicate claim rows in the Excel file. (Tr. 165-66.) She also removed the secondary insurer data rows using a methodology she had developed with Steinberg before the August 8, 2013 retrieval of data from the EDS computer. (Def. Mem., Exs. F-H; Tr. 164, 208; 3500-NG-1, at 49.)

On August 15, 2013, Agent Gruchacz sent a finalized Excel file — containing combined Economy and EDS data for 2011 and 2012 — to the MEDIC. (Supp. Hr. Ex. A ("MEDIC 1665"), at 3; 3500-NG-1, at 57.) She also included data regarding all drugs purchased by the Economy and EDS pharmacies during 2011 and 2012 as reported by the only two wholesale drug companies used by the pharmacies. (MEDIC 1665; Tr. 24, 168, 224.) The MEDIC analyzed data for 59 particular drugs, comparing the pharmacies' wholesale purchases of the 59 drugs against the total number of claims processed for the 59 drugs from the OPUS data. (MEDIC 1665.) The MEDIC concluded, in a report titled MEDIC 1665, that the "pharmacies reflected shortages with 45 out of the 59 drugs reviewed" and found that the "approximate dollar loss for the time period specified [2011 to 2012] for these drugs is $5,811,799.43." (*Id.*, at 4.) The $5.8 million estimated loss based on MEDIC 1665 was ultimately the loss

value reported in the superseding indictment. (*See* Superseding Indictment, at ¶ 26.)

E.   *The Second Audit: MEDIC 3123*

On December 14, 2015, the government provided the defense with Jencks Act material that included documents about the August 8, 2013 search. (ECF No. 69.) Defendant thereafter discussed the August 8, 2013 search with the government, and ultimately sought permission from the court to file a motion to suppress on January 26, 2016. (*Id.*)

After reviewing defendant's concerns, the government requested a second MEDIC audit that would not rely on any of the purportedly tainted EDS data obtained from the EDS computer on August 8, 2013. (Tr. 167-69, 243; ECF No. 70; 3500-NG-24-26.) To prepare the claims data for the new audit, Agent Gruchacz returned to the Excel file containing only Economy data sent by Steinberg on July 17, 2013. (Tr. 237.) Although the July 17, 2013 Economy Excel file was in the same folder on the HHS/OIG network as the EDS Excel file Steinberg sent on August 8, 2013, the files were entirely distinct and the data from EDS and Economy were not commingled. (Tr. 222.) Agent Gruchacz copied the 2011 and 2012 tabs from the July 17, 2013 Economy Excel file and placed them into a new Excel file. (Tr. 167-68, 237.) She then removed secondary insurers using the methodology she had learned before the August 8, 2013 search. (Def. Mem., Exs. F-H; Tr. 164, 208;

3500-NG-1, at 49.) Because Agent Gruchacz used only Economy data, there was no need to remove the duplicate entries produced when Economy and EDS data were combined (as they had been in the claims spreadsheets used for MEDIC 1665). (Tr. 51, 168.) On January 27, 2016, Agent Gruchacz forwarded the new Economy Excel file to the MEDIC along with the same wholesale drug information that had been forwarded for MEDIC 1665.[9] (Tr. 168, 224; Supp. Hr. Ex. B ("MEDIC 3123").)

The MEDIC then performed a second audit, referred to as MEDIC 3123, using the documents sent by Agent Gruchacz on January 27, 2016. (MEDIC 3123.) MEDIC 3123 was prepared on February 3, 2016, and concluded — based on an evaluation of the same 59 drugs reviewed in MEDIC 1665[10] — that "the approximate dollar loss for the time period specified and for these drugs is $5,317,252.32." (MEDIC 3123, at 4.) Agent Gruchacz testified that the approximately $500,000 disparity between MEDIC 3123 and the earlier MEDIC 1665 audits was caused by the fact that the EDS pharmacy was opened for

---

[9] Because the wholesale drug information provided to the MEDIC for the second audit included drugs purchased by both EDS and Economy, while the claims data provided for the second audit contained only Economy claims data, defendant received the benefit of the assumption of additional wholesale drug purchases that could not be definitively matched to Economy. (Tr. 244-45.)

[10] MEDIC 3123 appears to contain a typographical error with respect to the list of pharmaceuticals evaluated. Specifically, the drug Combivir was inadvertently excluded from the list. (*Compare* MEDIC 1665, at 2, *with* MEDIC 3123, at 1-2.) This error does not appear to have affected the validity of the analysis because Combivir was clearly considered in the MEDIC 3123 audit. (*See* MEDIC 3123, at 4.)

only a few months in 2012. (Tr. 244-45.) Stated otherwise, the estimated loss value in MEDIC 3123 was smaller because, although the wholesale purchase data remained the same, EDS claims data was included in MEDIC 1665 but excluded from MEDIC 3123.

Defendant subsequently filed the instant suppression motion. (Def. Mem.) The government filed an opposition. (ECF No. 73, Response in Opposition to Motion to Suppress ("Gov't Opp'n").) Defendant thereafter filed a reply. (ECF No. 78, Reply to Response to Motion to Suppress ("Def. Reply").) After the hearing, defendant submitted a post-hearing brief (ECF No. 85, Defendant's Post-Hearing Memorandum of Law in Support of His Motion to Suppress ("Def. Post-Hearing Br.")), to which the government responded. (ECF No. 90, Opposition to Defendant's Post-Hearing Submission ("Gov't Post-Hearing Br.").)

## LEGAL STANDARD

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. When a defendant has moved to suppress evidence that he contends derives from an illegal search, he "bears the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *United States v. Osorio*, 949 F.2d 38, 40 (2d Cir. 1991) (citations omitted); *see also United States v. Pers.*, No. 09-CR-983, 2011 WL 2019252, at *1 (S.D.N.Y. May 18, 2011). Where an illegal search has been demonstrated, however, the government "has

15

the ultimate burden of persuasion to show that its evidence . . . was not tainted through a connection to the illegally procured" evidence. *United States v. Sapere*, 531 F.2d 63, 66 (2d Cir. 1976).

## DISCUSSION

Defendant moves to suppress "both MEDIC 1665 and MEDIC 3123, and preclude any evidence of either at the impending trial."[11] (Def. Post-Hearing Br. at 15.) The court will address the two audits in turn.

A. *MEDIC 1665*

Defendant first moves to suppress MEDIC 1665. The government has represented, however, that it will not use MEDIC 1665 at trial. (*See* Gov't Post-Hearing Br. at 1.) The court therefore denies the motion as moot.

An "issue is moot [when] it no longer offers a live controversy for decision." *Lavin v. United States*, 299 F.3d 123, 128 (2d Cir. 2002) (citing *Murphy v. Hunt*, 455 U.S. 478, 481 (1982)). In criminal cases where the government agrees not to use evidence that the defendant seeks to suppress, there is no longer

---

[11] Defendant originally also sought to suppress data regarding "killed Rx claims," which are prescriptions that were negated in pharmacy computers where drugs were not dispensed. (ECF No. 72-1, Stavis Affidavit, at ¶¶ 16-17; *see also* Def. Mem. at 2-3, 5.) The government did not object. The court granted defendant's motion to suppress reports regarding "killed Rx" claims at the suppression hearing on April 28, 2016. (Tr. 169-70 (The Court: "Are you agreeing, then, to suppress the killed Rx reports that [defendant] has moved against as part of his motion?" The Government: "Yes." The Court: "Motion granted on the killed Rx reports.").)

a live controversy for decision. In *United States v. Robles*, for example, a criminal defendant moved for suppression of evidence obtained in the search of a vehicle. *See* No. 04-CR-1036, 2005 WL 957338, at *1, *3 (S.D.N.Y. Apr. 22, 2005). After the government represented that it would not use the evidence obtained from the vehicle, the court denied the suppression motion as moot. *Id.* at *3 ("As the Government represents that it will not seek to use any of evidence obtained during this search at trial, the motion will be denied as moot."); *see also United States v. Kline*, No. 15-CR-503, 2015 WL 7018618, at *1 n.1 (S.D. Cal. Nov. 12, 2015) ("[T]he parties agree that the motion to suppress statements . . . is moot on the grounds that the Government has represented it will not use the statements in its case-in-chief."); *United States v. Martin*, No. 14-CR-125, 2014 WL 3700917, at *3 (D. Minn. July 25, 2014) ("Defendant's Motion to Suppress Evidence . . . has been rendered moot by the Government's express representation in its written briefing to this Court that it will not use the disputed evidence in its case-in-chief . . . .").

Here, the government has explicitly stated on multiple occasions that it will not use MEDIC 1665 during the trial. (*See* Gov't Post-Hearing Br. at 1 ("After considering the issue raised by the defense, the government agreed not to use MEDIC 1665."); Tr. 187 (The Government: "[W]e have agreed not to use 1665."); Gov't Opp'n at 1 ("[T]he government has decided, without admitting

error, that it will not use [MEDIC 1665].").) The government's express representations that it will not use MEDIC 1665 renders defendant's motion to suppress MEDIC 1665 moot. *See Lavin*, 299 F.3d at 128; *Robles*, 2005 WL 957338, at *3.

B.   *MEDIC 3123*

Defendant has also moved to suppress MEDIC 3123 as "fruit of the poisonous tree." (Def. Post-Hearing Mem. at 9.) Although the inquiry into MEDIC 3123 requires a more fulsome analysis, the court is persuaded that MEDIC 3123 is untainted by any unconstitutionality that may have infected MEDIC 1665 due to the August 8, 2013 search.

Defendant argues that MEDIC 3123 is the fruit of the poisonous tree for essentially three reasons: (1) the same Economy spreadsheet was used in generating both MEDIC 1665 and MEDIC 3123 (Def. Post-Hearing Br. at 9-10); (2) MEDIC 3123 was created using a method developed by Agent Gruchacz and Steinberg utilizing a comparison of the tainted EDS data and the Economy data (*id.* at 10-11); and (3) Agent Gruchacz perjured herself during her testimony about the August 8, 2013 search, and the court must therefore reject her testimony regarding the integrity of MEDIC 3123. (*Id.* at 11-14.) The government maintains that "[t]here is simply no evidence . . . that there was any commingling of data between the MEDIC 1665 data and the MEDIC 3123 data. Each

reconciliation analysis was performed separately." (Gov't Post-Hearing Br. at 2; *see also* ECF Nos. 73, 80.)

Defendant first argues that MEDIC 3123 must be suppressed because the "very same Economy spreadsheet underlies both MEDIC 1665 and MEDIC 3123." (Def. Post-Hearing Br. at 9.) Defendant, however, ignores the fact that the original Economy spreadsheet underlying MEDIC 1665 contained entirely untainted data.

*Generating MEDIC 1665*

To provide the MEDIC with the claims data for MEDIC 1665, Agent Gruchacz made copies of the 2011 and 2012 tabs from the original, Economy spreadsheet sent to her by Steinberg on July 17, 2013, which was sourced from untainted data seized pursuant to the search warrant. (Tr. 164-66.) Agent Gruchacz placed the copied tabs into a *new spreadsheet*. (Tr. 164.)

With respect to the EDS data, Agent Gruchacz copied — into the same, new spreadsheet — data from the 2011 and 2012 tabs in the EDS spreadsheet sent by Steinberg after the allegedly unconstitutional August 8, 2013 search of the EDS computer. (Tr. 165-66.) She then edited the new spreadsheet in two ways: she eliminated secondary insurer rows and removed duplicate claim rows. (*Id.*)

*Generating MEDIC 3123*

To create the claims spreadsheet underlying MEDIC 3123, Agent Gruchacz returned to the same original Economy spreadsheet sent to her by Steinberg on July 17, 2013. (Tr. 237.) The *original* July 17, 2013 Economy spreadsheet was never commingled with the EDS spreadsheet Steinberg sent to Agent Gruchacz on August 8, 2013. (Tr. 222.) Agent Gruchacz again copied the 2011 and 2012 tabs from the original Economy spreadsheet and pasted them into a new Excel spreadsheet. (Tr. 167-68, 237.) She edited the new spreadsheet by eliminating secondary insurers. (Tr. 168.) There was no need to remove duplicate claims because Agent Gruchacz did not include any EDS data in the new spreadsheet. (Tr. 168.) The new spreadsheet containing only the Economy claims data was used to generate MEDIC 3123. (Tr. 168.) Because the data in the original Economy spreadsheet sent by Steinberg on July 7, 2013 was entirely untainted, the copies of the 2011 and 2012 tabs for Economy in that spreadsheet placed into the final Excel spreadsheet underlying MEDIC 3123 were also untainted. The MEDIC 3123 analysis did not rely on any data regarding EDS.

Defendant essentially contends, without any citation to evidence in the record or legal authority, that any use of the "same office computer network and folders which contained the tainted EDS data" would be impermissible. (Def. Post-Hearing Br. at 9-10.) Under defendant's line of argument, the only way to

ensure the legitimacy of data underlying a new audit would be to send Steinberg the actual seized hard drive from Economy Drug. Any other method would involve using the same HHS/OIG network that contained the purportedly unconstitutionally seized August 8, 2013 data. Such a drastic remedy is unnecessary. There is no reason to believe that the data sent by Steinberg on July 7, 2013 — which formed the basis for the Economy Excel file underlying MEDIC 3123 — was ever commingled with *any* EDS data. Consequently, defendant's argument that any data stored on the same HHS/OIG network as the August 8, 2013 data is necessarily tainted must be rejected.

Defendant next argues that Agent Gruchacz employed a "methodology" to edit the claims spreadsheets underlying the second audit that she developed with Steinberg after the August 8, 2013 search. (Def. Post-Hearing Br. at 10-11.) Because the alleged "method" was learned using data obtained in the purportedly illegal search, defendant contends, MEDIC 3123 must be suppressed. (*Id.*) Defendant's argument ignores the significant chronology as well as the nature of the Economy data submitted to the MEDIC which resulted in MEDIC 3123.

There are essentially two "methodologies" at issue here. The first is the methodology employed by Agent Gruchacz, with Steinberg's expertise and assistance, to remove secondary insurer lines in the claims spreadsheets. The second is the methodology employed by Agent Gruchacz, with Steinberg's expertise and

assistance, to remove duplicate claims when the Economy and EDS data were combined.

First, regarding secondary insurers, it is critical to note that Agent Gruchacz and Steinberg developed the method of removing secondary insurer lines in the data *before* the disputed August 8, 2013 search. Agent Gruchacz's contemporaneous notes reveal that she and Agent Gruchacz developed the method of removing secondary insurer data — which required searching for lines containing the "$" symbol in a particular column and deleting the entries — before obtaining the EDS data on August 8, 2013. (Def. Mem., Exs. F-H.) Agent Gruchacz confirmed the effectiveness of the method on the morning of August 8, 2013. The following email exchange took place between 9:40 a.m. and 9:50 a.m. on August 8, 2013, before Steinberg's late-night August 8, 2013 EDS search:

- Agent Gruchacz to Steinberg: "If I just deleted all of the $ sign lines . . . wouldn't that be an easy way of removing all the secondary payor lines?

- Steinberg to Agent Gruchacz: "Correct that will do it . . . ."

(3500-NG-1, at 49.) It is clear that Agent Gruchacz and Steinberg had consulted about a method to remove secondary insurer lines before the purportedly unconstitutional August 8, 2013 search. The dollar-sign extraction method was the same method Agent Gruchacz used when she edited the final Economy Excel spreadsheet sent to the MEDIC to generate MEDIC 3123. (Tr. 164, 168.)

Next, with regard to duplicate entries in both the EDS and Economy data, defendant appears to argue that Agent Gruchacz employed the second method discussed above in the generation of the Economy Excel spreadsheet underlying MEDIC 3123. (Def. Post-Hearing Br. at 10 ("[T]he purportedly untainted Economy spreadsheet . . . was created and edited through a process which required comparison of the supposedly untainted Economy data with the illegally seized EDS data.").) Even if the court were to accept the defendant's argument — presented without evidentiary or legal support — that a valid methodology to eliminate duplicate claims learned during an illegal search could require suppression of evidence created using that methodology, the argument would fail in this case. That is because the Economy Excel spreadsheet underlying MEDIC 3123 never contained EDS data of any kind. (Tr. 168.) Consequently, it was entirely unnecessary, in creating the Excel spreadsheet containing only Economy data for MEDIC 3123, to employ the duplicate-entry elimination method utilized for the Excel spreadsheet containing both Economy and EDS data underlying MEDIC 1665. Accordingly, no methodology learned after the August 8, 2013 search was used to generate the Economy Excel spreadsheet underlying MEDIC 3123, and defendant's argument otherwise must be rejected.

Defendant lastly argues that the court should reject Agent Gruchacz's testimony entirely because of her "inconsistent

and incredible testimony" regarding the August 8, 2013 search. (Def. Post-Hearing Br. at 11-15.) Defendant argues that because Agent Gruchacz's testimony about the August 8, 2013 was false, her testimony that MEDIC 3123 was untainted must be disbelieved. (*Id.*) The court disagrees for two primary reasons.

First, the court finds that Agent Gruchacz's testimony regarding the August 8, 2013 search was credible. The email exchange on August 8, 2013 certainly reflects that Agent Gruchacz *should* have understood that Steinberg would need to log in to EDS's in-store computer in order to perform the search. OPUS COO Ward wrote to Agent Gruchacz on August 8, 2013 seeking verification that Agent Gruchacz wanted "[Steinberg] to dial into the store" and explained that the "data is not in the cloud." (Supp. Hr. Ex. C.) Agent Gruchacz wrote back to Ward that she read the emails in the chain, and confirmed that she wanted Steinberg to "log in at night." (*Id.*) Agent Gruchacz subsequently testified that she believed that the data "was in the cloud, that [OPUS and EDS] had equal access to the data." (Tr. 160.) She also testified on cross-examination that she didn't understand what "into the store" meant. (Tr. 233.)

The Supreme Court has explained that a witness commits perjury when "she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United*

*States v. Dunnigan*, 507 U.S. 87, 94 (1993) (discussing 18 U.S.C. § 1621). The federal definition of perjury recognizes that witnesses are capable of misunderstanding facts, even where they should have been obvious. Agent Gruchacz, the court concludes, made a mistake. She either was not paying adequate attention to the precise language in the emails she received or she simply did not understand them or recall them correctly. Further, "some information, concerning demeanor, non-verbal responses, and the like, is necessarily lost in the translation of a live proceeding to a cold transcript." *ABC, Inc. v. Stewart*, 360 F.3d 90, 99–100 (2d Cir. 2004) (internal quotation marks and citation omitted). In evaluating Agent Gruchacz's demeanor, the court finds that she appeared to be truthful and forthcoming when she testified about her understanding of what the August 8, 2013 search would entail, and her subsequent forthright recognition and acknowledgement that her understanding had been mistaken. Accordingly, the court finds that she did not testify falsely.

Second, even if the court were convinced that Agent Gruchacz testified falsely about the August 8, 2013 search, she had no incentive to testify falsely about the source of the data in the Economy Excel spreadsheet underlying MEDIC 3132. The government has been in possession of every relevant piece of raw claims data for Economy Drug and EDS since the execution of the warrants at both pharmacies on June 20, 2013. (Tr. 124.) The data

obtained in the August 8, 2013 search was merely a subset of the legitimately obtained data. (*Id.*) Accordingly, the court finds credible Agent Gruchacz's testimony, which is corroborated by substantial evidence in the record, that MEDIC 3123 was based on Economy data obtained during the execution of the search warrant, and not on any data obtained from EDS on August 8, 2013. In any event, the August 8, 2013 data is not being presented at trial by the government.

## CONCLUSION

Although the warrantless August 8, 2013 search of the EDS computer is troubling, the court concludes that MEDIC 3123 does not contain any data tainted by that search. The Economy Drug Excel spreadsheet send to the MEDIC to perform the analysis that led to MEDIC 3123 was derived entirely from legitimately sourced data. Further, there is no live controversy regarding MEDIC 1665 because the government has stated that it will not use MEDIC 1665 at trial.[12] Defendant's motion to suppress is therefore respectfully DENIED.

**SO ORDERED.**

```
_____/s/_____
KIYO A. MATSUMOTO
United States District Judge
```

Dated:

May 23, 2016
Brooklyn, New York

---

[12] On May 19, 2016, defendant notified the court that the government has amended MEDIC 3123. (ECF No. 96.) Because there has been no factual development beyond defendant's letter regarding the amended audit, the court has not considered the letter in deciding the instant motion. The court's analysis on the instant motion applies only to MEDIC 1665 and MEDIC 3123.