

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

| | |
|---|---|
| SCJ:WPC | *271 Cadman Plaza East* |
| F.# 2014R01466 | *Brooklyn, New York 11201* |

August 19, 2016

**By ECF**

The Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:    United States v. Andrew Barrett
>           Criminal Docket No. 15-103 (KAM)

Dear Judge Matsumoto:

The government respectfully submits this sentencing letter regarding the defendant Andrew Barrett, who is scheduled to be sentenced on September 9, 2016 at 11:00 a.m. Barrett, who pleaded guilty to healthcare fraud and tax fraud, was a New York State licensed pharmacist and the owner of four pharmacies. From his Queens, New York pharmacies, he fraudulently billed Medicare $2.7 million for drugs he did not dispense. He then used his Bronx and Rockland County pharmacies to launder the unlawful proceeds and siphoned funds from the accounts of those pharmacies by fraudulently claiming more than $2 million as business expenses.

According to the pre-sentence investigation report ("PSR"), the defendant's total offense level under the United States Sentencing Guidelines (the "Guidelines") is level 29 and his Criminal History Category is I, which yields a range of imprisonment of 87 to 108 months. See PSR at ¶¶ 46, 49 and 86. The plea agreement in this case estimated the defendant's adjusted offense level at level 24 and the Criminal History Category I, which yielded an estimated Guidelines range of imprisonment of 51-63 months.

The government does not advocate for a Guidelines range beyond the estimated range in the plea agreement. A sentence of imprisonment of between 51 and 63 months would accomplish the goals of Section 3553(a) of Title 18 of the United States Code: namely, to reflect the seriousness of these offenses, promote respect for the law, provide just punishment, general deterrence and avoid unwarranted sentencing disparities.

I.      Procedural Background

On June 20, 2013, the defendant was arrested on a complaint and charged with health care fraud.   The defendant was accused of fraudulently submitting claims to Medicaid for pharmaceutical products he did not actually dispense.  See Complaint at Docket Entry ("DE") #1.  The complaint was dismissed without prejudice on November 1, 2013.  See DE #17.

On March 19, 2015, the defendant was arraigned on an indictment charging Medicare and Medicaid fraud, filing false claims, money laundering and tax fraud.  See Indictment at DE #18.  A bail hearing was also conducted before the Honorable Steven M. Gold, United States Magistrate Judge.  The court granted the request for bail and set the bond in pertinent part as follows:  $500,000 secured by the defendant's residence and a prohibition "from submitting claims or causing claims to be submitted to Medicare [and] Medicaid programs."  See Order Setting Conditions of Release and Bond at DE #23.  A month after his arraignment, the defendant purportedly sold his pharmacy.

Jury selection for the defendant's trial was scheduled for May 31, 2016.  But, on May 17, 2016, after a two-day hearing, the Court found that there was probable cause to believe the defendant violated the conditions of his bond by committing another crime and clear and convincing evidence that he violated conditions of his bond.  On May 17, 2016, the Court revoked the defendant's bail and remanded the defendant into custody.

On May 25, 2016, the defendant pleaded guilty, pursuant to a plea agreement, to Counts One (Health Care Fraud) and Twenty-Five (Tax Fraud) of the Indictment.  The defendant stipulated to the health care loss amount of $2.7 million and the tax loss amount of $736,192.80.

II.     The Offense Conduct

Barrett was a New York State licensed pharmacist.  During the relevant period, he owned two pharmacies in the Eastern District of New York, namely, Economy Drug and Surgical ("Economy Drug") located in Queens, New York and EDS Pharmacy ("EDS") located in Nassau County, New York.  Barrett also owned B&P Pharmacy ("B&P") in the Bronx and Clarkstown Pharmacy ("Clarkstown") in Rockland County, New York. Barrett also maintained bank accounts for each pharmacy.

From 2011 to 2012, Barrett billed Medicare from Economy Drug for medications he did not dispense to customers or patients.  In doing so, he fraudulently received $2.7 million from Medicare that was deposited into the Economy Drug bank account.   Barrett used some of these unlawful proceeds to buy pharmaceutical products for B&P and Clarkstown.

Barrett then siphoned off more than $2 million from the B&P and Clarkstown bank accounts.  He did this by taking the B&P and Clarkstown funds for his personal use while fraudulently claiming those deductions as business-related expenses on his tax returns.  Through this scheme, he caused a tax loss of $736,192.80.

III.    The Sham Sale Of Economy Drug

On April 17, 2015, one month after the arraignment on the indictment, Barrett purportedly entered into a transaction to sell Economy Drug.  The terms of Barrett's release bond stated that he could not submit claims or cause claims to be submitted to Medicare and Medicaid.  The purported sale price was $350,000.  The purported buyer was to pay $25,000 at the closing and $325,000 over the course of 60 months after the closing.

As the May 16-17, 2016 bail revocation hearing demonstrated, Barrett did not "sell" his pharmacy.  He allowed the purported buyer – a straw buyer – to use the pharmacy's own funds as the $25,000 down payment.  The straw buyer never paid any of the remaining $325,000.  However, Barrett had a purported contract of sale he could hold up as proof of the purported sale.  All the while, he continued to control Economy Drug and continued to submit claims to Medicare and Medicaid.

Around the time that federal agents came to Economy Drug and interviewed employees there, the defendant began to direct the activities of Economy Drug from afar by using disposable, unregistered phones, also known as "burner phones," and using the alias "Jack" in an effort to hide his control of Economy Drug.

IV.    Barrett's Guidelines Range

The Guidelines estimate in the plea agreement for Count One is as follows:

| U.S.S.G. Description | U.S.S.G. Section | Points |
| --- | --- | --- |
| Base Offense Level | 2B1.1 | 6 |
| Loss Amount More Than $1.5 Million | 2B1.1(b)(1)(K) | +16 |
| Loss to Government Health Program | 2B1.1(b)(7) | +2 |
| Obstruction | 3C1.1 | +2 |
| Acceptance of Responsibility | 3E1.1(a) and (b) | -3 |

3

| Total Offense Level | | 23 |
|---|---|---|

The Guidelines estimate in the plea agreement for Count Twenty-Five is as follows:

| U.S.S.G. Description | U.S.S.G. Section | Points |
|---|---|---|
| Base Offense Level | 2T4.1(H) | 20 |
| Over $10,000 in Criminally Derived Income | 2T1.1(b)(1) | +2 |
| Total Offense Level | | 22 |

The grouping analysis calculated in the plea agreement for the two counts is as follows:

| U.S.S.G. Description | U.S.S.G. Section | Points |
|---|---|---|
| Highest Offense Level | | 26 |
| Count One (units) | 3D1.4(a) | 1 |
| Count Twenty-Five (units) | 3D1.4 | 0 |
| Total units | | 1 |
| Levels added | 3D1.4 | 0 |
| Combined Offense Level | 3D1.4 | 26 |

V.     Barrett Obstructed Justice

Barrett argues that the Guidelines enhancement for Obstruction pursuant to §3C1.1 is inappropriate.  Barrett is wrong.

The Guidelines provide for a two-point enhancement for obstruction of justice relating to the defendant's offense of conviction or a closely related offense during the investigation, prosecution, or sentencing of the offense of conviction.  U.S.S.G. § 3C1.1. The Guidelines thus contain both a temporal element, requiring that the obstruction take

4

place during the criminal adjudication, and a nexus element, requiring that the obstructive conduct relate to the offense of conviction.  United States v. Byors, 586 F.3d 222, 227 (2d Cir. 2009).  In determining whether the obstruction of justice enhancement applies, it is "essential" that the sentencing court make "a finding that the defendant had the specific intent to obstruct justice, *i.e.*, that the defendant consciously acted with the purpose of obstructing justice." United States v. Young, 811 F.3d 592, 604 (2d Cir. 2016) (quoting United States v. Brown, 321 F.3d 347, 351 (2d Cir. 2003)).  In determining whether the obstruction of justice enhancement is appropriate, the sentencing court is entitled to use the preponderance of evidence standard.  See United States v. Shoulberg, 895 F.2d 882, 886 (2d Cir. 1994).

A.  Defendant Violated a Condition of His Release with the Specific Intent to Obstruct Justice During His Prosecution

The defendant's violation of the terms of his release bond is the type of conduct covered by the obstruction enhancement.  For example, in United States v. Defeo, the defendant's failure to report to pretrial services and attempt to smuggle an uncontaminated urine sample to pretrial services in order to evade the conditions of her release bond made the obstruction of justice enhancement appropriate.  36 F.3d 272, 276-77 (2d Cir. 1994).  Other circuits agree that violations of release conditions can support an obstruction of justice enhancement.  See United States v. Hess, 402 F. App'x 751, 753 (4th Cir. 2010) (unpublished decision) (affirming sentencing court's application of obstruction of justice enhancement to defendant on the basis of numerous pretrial release violations); United States v. Fread, 73 F.3d 374, *3 (10th Cir. 1995) (unpublished table decision) (affirming sentencing court's application of obstruction of justice enhancement to defendant who violated condition of release to reside at halfway house, violated condition restricting travel and intended to violate condition requiring him to submit to drug and alcohol screening).  United States v. Woodard, however, instructs that a defendant's flight from a jurisdiction, a violation of release conditions, cannot support an enhancement for obstruction of justice in the absence of specific intent to obstruct justice.  239 F.3d 159, 162 (2d Cir. 2001) (remanding for factual finding that defendant left jurisdiction prior to sentencing with the specific intent to obstruct justice).  However, Woodard approved of Defeo, indicating that the defendant's flight in order to prevent the enforcement of release conditions constituted specific intent to obstruct justice.  Id.

Here, the defendant violated a condition of his release with the specific intent to obstruct justice.  The defendant was released on the condition that he not commit further crimes, but committed conspiracy to commit wire fraud in an effort to evade the condition that he not submit claims or cause claims to be submitted to Medicare or Medicaid.  The defendant concocted a sham transaction to transfer ownership of Economy Drug to a straw buyer while maintaining operational control of the business.  The defendant later employed covert means, including the use of burner phones and a pseudonym, to maintain operational control.  No explanation exists for such conduct other than that the defendant was attempting

5

to evade the condition of his release requiring him not to submit claims to Medicare and Medicaid.  Like in Defeo, the defendant here violated a condition of his release in order to prevent the enforcement of another release condition, indicating that he had a specific intent to obstruct justice.

The temporal and nexus elements set forth by the Second Circuit in Byors are established by the defendant's violations of the conditions of his release pending trial for health care fraud.  See Byors, 586 F.3d at 227.  The temporal element is satisfied because the defendant obstructed justice during his prosecution.  The nexus element is satisfied because the defendant obstructed the conditions of release imposed upon him during his prosecution for the offense of conviction.  There are overwhelming additional connections between the defendant's obstructive behavior and the underlying offense.  For instance, the very tool the defendant employed to obstruct justice, Economy Drug pharmacy, was at the heart of the health care fraud scheme.  The Court imposed the condition that the defendant attempted to evade – his promise not to submit or cause to submit claims to Medicaid or Medicare – in order to prevent economic harm from the underlying health care fraud.  The defendant's obstructive behavior and the underlying offense are thus inextricably linked.

This court should apply the obstruction of justice enhancement because the defendant, with the specific intent to obstruct justice, obstructed justice in relation to his offense of conviction during his prosecution.  Because the Court found that the defendant conspired to commit wire fraud by a preponderance of the evidence and that he caused Medicaid claims to be submitted by clear and convincing evidence, the earlier factual findings are sufficient to support the obstruction of justice enhancement under the preponderance of the evidence standard.

      B.   Defendant Provided Materially False Information to Pretrial Services
           During His Prosecution with the Specific Intent to Obstruct Justice

Under the Guidelines, "providing materially false information to a probation officer in respect to a presentence or other investigation for the court" is covered by the obstruction enhancement.  U.S.S.G. § 3C1., n.4(H).  In United States v. Thompson, the court determined that there is "no basis" for distinguishing between pretrial services officers and probation officers for the purposes of the predecessor of Application Note 4(H).  924 F.2d 1331, 1347-48 (7th Cir. 1991) (applying the obstruction enhancement to a defendant who provided materially false information regarding where he slept to a pretrial services officer).

A "material" statement is one that "would tend to influence or affect the issue under determination."  U.S.S.G. § 3C1.1, n.6.  Falsely obtaining bail has the "potential to impede the investigation or prosecution of a case."  United States v. Butters, 513 Fed. App'x 103, 1 (2d Cir. 2013) (summary order) (quoting United States v. Khimchiachvili, 372 F.3d 75, 78 (2d Cir. 2004), vacated on other grounds sub nom. Berwick v. United States, 544 U.S. 917 (2005)) (internal quotation marks omitted).  A false statement made to procure bail thus

falls within the scope of the obstruction enhancement, as long as the defendant makes the statement with the specific intent to obstruct justice.  See id.

Here, the defendant repeatedly made materially false statements to the pretrial services officer.  No distinction should be made between a statement made to procure release on bail and a statement made to maintain release on bail, as bail is subject to revocation.  Thus, each such statement is material.  The defendant repeatedly stated that he was unemployed while he was, in fact, covertly operating Economy Drug.  The defendant stated that he had not submitted or caused to be submitted any claims to Medicare or Medicaid.  This statement was also false, as the Court found by clear and convincing evidence that the defendant caused such claims to be submitted.  As set forth above, these false statements allow for no other conclusion than that the defendant had the specific intent to obstruct justice by evading the Court's pretrial release conditions.  No plausible reason exists to explain such false statements other than that the defendant was trying to evade the Court's conditions during his prosecution.

VI.     Barrett Accepted Responsibility by Pleading Guilty

The PSR provides no credit for acceptance of responsibility.  Application note 4 to section 3E1.1 states:

> Conduct resulting in an enhancement under §3C1.1 (Obstruction) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct.  There may, however, be extraordinary cases in which adjustments under both §§ 3C1.1 and 3E1.1 may apply.

Here, Barrett engaged in a sham sale and obstructive conduct starting one month after the arraignment on the indictment.  The government discovered his misconduct and brought it to the Court's attention.  After a hearing, the Court found that he violated the terms of his bond and remanded the defendant two weeks before trial.  Barrett then decided to plead guilty a few days before trial.  It appears he finally accepted responsibility for his crimes.

VII.    A Sentence Within 51 to 63 Months Is Appropriate

a.  Legal Standard

In United States v. Booker, the Supreme Court held that the Guidelines are advisory and not mandatory, and the Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentences, but also may tailor the sentence in light of other statutory concerns.  United States v. Booker, 125 S. Ct. 738, 743 (2005); see 18 U.S.C. § 3553(a).  Subsequent to Booker, the Second Circuit held that "sentencing judges

7

remain under a duty with respect to the Guidelines . . . to 'consider' them, along with the other factors listed in section 3553(a)." United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005). Although the Court declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, the Court cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." Id. at 113.

Later, in Gall v. United States, the Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

b.  Application of 18 U.S.C. § 3553(a) Factors

The government respectfully submits that the Court should impose a sentence within the advisory Guidelines range of imprisonment as set forth in the plea agreement, which is 51 to 63 months, because such a sentence is appropriate to account for the "nature and circumstances of the offense" and to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(1)-(2)(A). A sentence within that range will also promote general deterrence. See id. at § 3553(a)(2)(B).

Health care fraud is a serious offense that targets a national program relied on by millions of Americans. Congress aptly summarized the effects of the defendant's crime over thirty years ago:

> In whatever form it is found . . . fraud in these health care financing programs adversely affects all Americans. It cheats taxpayers who must ultimately bear the financial burden of misuse of funds in any government-sponsored program. It diverts from those most in need, the nation's elderly and poor, scarce program dollars that were intended to provide vitally needed quality health services.

H.R. 95-393, pt. II, at 44 (1977). See also H.R. Rep. 104-747 (1996) ("Everyone pays the price for health care fraud: beneficiaries of Government health care insurance such as Medicare and Medicaid pay more for medical services and equipment; consumers of

private health insurance pay higher premiums; and taxpayers pay more to cover health care expenditures.").

A Guidelines sentence as estimated in the plea agreement is necessary to reflect the seriousness of the offense, promote respect for the law and provide general deterrence. Barrett's two-year long fraud caused Medicare to lose $2.7 million and caused tax losses in the amount of more than $736,000.

Given that fraud schemes like Barrett's are typically difficult to detect and prosecute, there is a greater need for general deterrence. See, e.g., Harmelin v. Michigan, 501 U.S. 957, 988 (1991) (noting that "since deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties"). Moreover, because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." See, e.g., United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, White–Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005)) (internal quotation marks omitted)); United States v. Heffernan, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); Drago Francesco, Roberto Galbiati & Pietro Vertova, The Deterrent Effects of Prison: Evidence From a Natural Experiment, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general deterrence.").

Congress recognized the need to afford adequate deterrence as "particularly important in the area of white collar crime" when it adopted Section 3553. See S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259. Congress rightly was disturbed that "white collar criminals often are sentenced to small fines and little or no imprisonment," and noted that, "[u]nfortunately, this creates the impression that certain offenses . . . can be written off as a cost of doing business." Id.

In adopting the Section 3553 sentencing factors, Congress emphasized the essential deterrent value of imprisoning white collar criminals, even when those criminals themselves might be unlikely to reoffend:

> The Committee is of the view that in the past there have been many cases, particularly in the instances of major white collar crime, in which probation has been granted because the offender required little or nothing in the way of institutionalized rehabilitative measures . . . and because society required no insulation from the offender, without due consideration being given to the fact

9

that the heightened deterrent effect of incarceration and the readily perceivable receipt of just punishment accorded by incarceration were of critical importance. The placing on probation of [a white collar criminal] . . . may be grossly inappropriate . . . in cases in which the circumstances mandate the sentence's carrying substantial deterrent or punitive impact.

Id. at 91-92.

The defendant's punishment should take into account the need to deter other pharmacists from stealing from health care programs including Medicare and Medicaid. Health care fraud is a serious problem that has warranted national law enforcement attention. Although federal law provides significant periods of incarceration for those who steal from these programs, this fraud continues at alarmingly high rates. In determining a just sentence, the Court should consider the need to promote respect for the criminal fraud laws. Here, a Guidelines sentence as estimated in the plea agreement will serve to deter pharmacists who, like Barrett, may be tempted to place their financial interests above all else.

A sentence within the Guidelines range estimated in the plea would be consistent with sentences meted out to other, similarly situated health care fraud defendants:

1.      In United States v. Dmitry Shteyman, 10-CR-347 (Johnson, J.), Shteyman was the driving force behind a kickback and Medicare fraud scheme. Under his direction, a medical clinic paid $50 kickbacks to patients transported to the clinic for treatments they did not need or did not receive. The defendant and his conspirators submitted over $3.4 million in such fraudulent bills to Medicare, which paid approximately $1.48 million. Shteyman pleaded guilty to conspiracy to commit health care fraud and breached his cooperation agreement by lying about his own enrichment and overstating the enrichment of others as well as other lies. The government estimated his Guideline range to be 87 – 108 months. The court sentenced the defendant to 97 months' incarceration and restitution in the amount of approximately $1.48 million.

2.      In United States v. Gustave Drivas, 10-CR-771 (Gershon, J.), the defendant Gustave Drivas was the no-show medical director of a clinic involved in a massive, five-year health care fraud, kickback and money laundering scheme. The clinic billed Medicare for services to Medicare beneficiaries that were not provided or not needed. The clinic received from Medicare more than $50 million for the fraudulent claims. Drivas personally received approximately $511,000 in salary. He was sentenced to 151 months' incarceration, $511,000 in forfeiture and $50,943,386 in restitution. The judgment and sentence were affirmed on appeal.

VIII.    Conclusion

        For the reasons set forth above, the government respectfully requests that the Court impose a Guidelines sentence as estimated in the plea agreement, restitution to Medicare in the amount of $2.7 million and restitution in the amount of $736,192.80 to the Internal Revenue Service.

                    Respectfully submitted,

                    ROBERT L. CAPERS
                    United States Attorney
                    Eastern District of New York

        By:     /s/ William P. Campos
                    William P. Campos and
                    Erin Argo
                    Assistant U.S. Attorneys
                    (718) 254-6104/6049

cc:    Roger Stavis, Esq.
       Counsel for Defendant Andrew Barrett
       (by Email)